UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

**<u>COURT REDACTED</u>**

United States of America,      )
                               )
              Plaintiff,       )
                               )
       vs.                     )      File No. 1:18-cr-123
                               )
Jumareo Quartez James,         )
                               )
              Defendant.       )

<u>TRANSCRIPT OF SENTENCING</u>

Taken at
United States Courthouse
Bismarck, North Dakota
January 24, 2020

BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

<u>APPEARANCES</u>

MR. RICK LEE VOLK
U.S. Attorney's Office
220 E. Rosser Ave
P. O. Box 699
Bismarck, North Dakota 58502-0699

FOR THE UNITED STATES


- - - - - - - - - -


MS. MICHELLE ANN MONTEIRO
Assistant Federal Public Defender
Federal Plaza
324 North Third Street, Suite 1
Bismarck, North Dakota 58501

FOR THE DEFENDANT


- - - - - - - - - -


Certificate of Court Reporter - Page 41


- - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2     Honorable Daniel L. Hovland, United States District Court

3     Judge, presiding, commencing at 8:58 a.m., Friday,

4     January 24, 2020, in the United States Courthouse, Bismarck,

5     North Dakota.  The following proceedings were had and made of

6     record in open court with the defendant present.)

7                    - - - - - - - - - - -

8          THE COURT:  We'll open the record in the case of

9     *United States versus Jumareo James*.  Here on behalf of the

10    federal government is Assistant U.S. Attorney Rick Volk.

11    Representing the defendant here is Michelle Monteiro from the

12    Federal Public Defender's Office.  Mr. James, how are you

13    today?

14         THE DEFENDANT:  I'm doing fine, Your Honor.

15         THE COURT:  This is scheduled as a sentencing hearing

16    on a drug conspiracy offense involving oxycodone.

17         I have before today reviewed the Presentence

18    Investigation Report.  I read the Sentencing Memorandums of the

19    parties and Supplements.  I reviewed all of the letters of

20    support submitted on behalf of the defendant by friends and

21    family members, release status report from the United States

22    Probation Office from a while ago.  Reviewed the Plea

23    Agreement, the Plea Agreement Supplement.

24         I went just a few minutes ago, read the partial

25    transcript of the change of plea hearing that was filed.  I

08:58

08:59

08:59

08:59

3

1    spoke with representatives of the United States Probation

2    Office this morning, so I think I'm up to speed, but, Mr. Volk,

3    had you filed anything else?

4            MR. VOLK:  No, Your Honor.

5            THE COURT:  And, Ms. Monteiro, had you filed anything

6    else?

7            MS. MONTEIRO:  No, Your Honor.  I did file a

8    Sentencing Memorandum.  I think you may have said you read

9    that, but just --

10           THE COURT:  Yeah, I did.

11           MS. MONTEIRO:  Okay.  No, I have not.

12           THE COURT:  And, Mr. James, were you given the

13   opportunity to review the Presentence Investigation Report?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  And you've had a chance to talk to your

16   attorney about that?

17           THE DEFENDANT:  Yes, Your Honor.

18           THE COURT:  All right.  Mr. Volk, did you have any

19   objections to the facts or the guideline calculations outlined

20   in the Presentence Report?

21           MR. VOLK:  I don't, Your Honor.  Just for

22   clarification purposes, Ms. Monteiro and I had some discussion

23   after I had filed my Plea Agreement -- or, I'm sorry, the

24   Sentencing Memorandum and Supplement, and I have advised Ms.

25   Monteiro, as is noted in her -- in her Sentencing Memorandum,

09:00

09:00

09:00

09:00

09:01

4

1  that I would agree to recommend a sentence within the guideline

2  range based on a base offense level that we had contemplated in

3  the Plea Agreement.  That's the base offense level of 26 as

4  opposed to 28.

5          I think factually, based on Mr. James' statements at

6  the plea hearing, the 28 would be appropriate, but given our

7  Plea Agreement and what we had agreed to, I advised her I would

8  recommend a sentence within that total offense level of 26, and

9  that puts what -- what I've agreed that I would recommend would

10  be within the range of 110 to 137 months, I believe it was.

11          THE COURT:  Right.  Okay.

12          MR. VOLK:  Outside of that, no, Your Honor, I didn't

13  have any other objections or corrections to the Presentence

14  Report.

15          THE COURT:  Ms. Monteiro?

16          MS. MONTEIRO:  Your Honor, yes, I have formally

17  objected to the base level offense being 28, believing that it

18  should be 26, as Mr. Volk just discussed.  And I did formally

19  object to the facts contained in paragraph 8 regarding the base

20  level offense.  I had also objected to Mr. James' criminal

21  history category being V.

22          Upon discussions with Mr. Volk and his willingness to

23  agree upon our agreed-upon base level offense of 26 and based

24  on the admissions that Mr. James did make during the change of

25  plea hearing, I will withdraw that objection and agree that

09:01
09:01
09:02
09:02
09:02

1    Mr. James would be a criminal history category of V.  That

2    would result in a guideline range, as Mr. Volk said, of 110 to

3    137 months.

4           THE COURT:  But your only basis for the objection to

09:03   5    the base offense level is that the parties entered into a Plea

6    Agreement contemplating a 26 rather than a 28, correct?

7           MS. MONTEIRO:  Well, I guess factually I am objecting

8    that I -- I do believe that factually, what has been presented

9    in the Presentence Investigation, it should be a base level

09:03   10    offense of 26.

11           THE COURT:  And she -- the author said that she based

12    the base offense level of 28 on admissions made by the

13    defendant at the change of plea hearing.  And I read the

14    transcript from the change of plea hearing, and he did --

09:03   15    indeed, did admit to quantities that would trigger a base

16    offense level of 28.  I'll respect what the parties did in the

17    Plea Agreement.

18           MS. MONTEIRO:  That would be fine, Your Honor.

19           THE COURT:  But, I mean, we got to be intellectually

09:03   20    honest here.  It's -- the quantities are much higher than what

21    the parties agreed on.

22           Are there any witnesses that intend to testify today?

23           MR. VOLK:  I have none, Your Honor.

24           MS. MONTEIRO:  No, Your Honor.

09:04   25           THE COURT:  All right.  So, Mr. James, I'll give both

6

1    attorneys an opportunity to outline what they're recommending

2    for a sentence.  Then I'll give you a chance to speak, as I'm

3    required to do, and we'll start with Mr. Volk's recommendation.

4          MR. VOLK:  Your Honor, what we're recommending to the

5    Court is the Court impose a sentence of 110 months of

6    imprisonment with 3 years of supervision and the $100 special

7    assessment to be imposed upon Mr. James.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1 ////////////////////////////////////////////////////
2 /////////////////////////////////////////////////////////
3 //////////////////////////////////////////////////////
4 //////////////////////////////////////////////////////////
5 ////////////////////////////////////////////

6          This was intended sexual activity with a minor, was

7 the -- is the alleged new criminal conduct.  Mr. James is

8 charged in state court with that at the present time.  The

9 facts surrounding that have been supplied to the Court in our

10 Sentencing Memorandum Supplement through the charging document,

11 the affidavit, and the chat log that existed between Mr. James

12 and the undercover police officer.  And I think it's pretty

13 clear from those documents, what was intended by Mr. James, /////

14 /////////////////////////////////////////////////////////

15 ///////////////////////////////////////////////////

16 /////////////////////////////////////////////

17          This was significant and serious criminal conduct

18 here by Mr. James in the District of North Dakota.  He sold

19 and/or distributed a significant amount of oxycodone,

20 30-milligram pills up on the Fort Berthold Reservation.  He was

21 using local individuals up there to do so, many of his

22 co-defendants here in this case.  He returned multiple times.

23          He was doing this simply for profit.  He was -- he's

24 not a user of oxycodone.  He wasn't addicted to oxycodone.  He

25 was doing this simply for monetary benefit.  He contributed to

1   the opioid epidemic that this Court has seen throughout here in

2   this district, and whether intentionally or simply by his

3   conduct, this has encouraged others to engage in this similar

4   activity.

5   When I look at Mr. James' criminal history, it's

6   troubling, quite honestly.  I mean, he's a Criminal History

7   Category V, and a lot of his past criminal conduct involves

8   violence, drugs, intimidation of others, theft, where he's kind

9   of imposing his will on other people.

10   He has served prison time previously.  He had served

11   some jail time and then had revocations where prison terms were

12   imposed.  He does have -- his history of compliance on

13   supervision is not great.  There -- it appears when he's been

14   on probation, that his probation has been revoked.

15   And when I look at just kind of the type of criminal

16   activity that's been involved in his past, as I indicated, it's

17   somewhat troubling.  One incident involved what appears to be a

18   carjacking, and Mr. James, during the course of the attempt to

19   arrest him on that matter, fled from the police.  He ended up

20   running through yards and actually into somebody else's home

21   before he was actually apprehended and taken into custody.

22   That's paragraph 31 of the Presentence Report.

23   Paragraph 32 talks about a revocation matter where he

24   was revoked for punching a female 10 to 15 times, choking her,

25   kicking her.

9

1          Paragraph 34 was a domestic battery.

2          Paragraph 35 was a disorderly conduct that appears to
3     involve him and a number of women that he had taken to a hotel.
4     He was engaging in sexual activity.  There was some dispute
5     over money, and then a -- and then a fight broke out between --
6     between the group.

7          He also still has pending charges in Michigan that
8     appear to involve allegations of, you know, violent activity
9     involving child abuse and aggravated assault that are still
10    there, and so looking at that history, it -- it's just kind of
11    repetitive history since his early adulthood.  Otherwise, Your
12    Honor, you know, what the Presentence Report here reflects is
13    Mr. James acknowledged that effectively he's kind of sold drugs
14    to make a living.  That's referred to in paragraph 64.  I know
15    his upbringing hasn't been the best, but he's -- he appears to
16    have been kind of financing his way through life by selling
17    drugs.

18         Here, while he's been on supervision, there is a
19    pending revocation petition that I guess probably needs to be
20    dismissed once the Court imposes a sentence here.

21         But, you know, he's -- he's maintained some
22    employment here, but it's been kind of one thing after another.
23    It looks like he's had seven different employers in 2019.

24         And he's been associating with individuals that
25    clearly are not good for him.  He's been a little evasive on

10

supervision.  He had -- paragraph 69 refers to his trip out to
Michigan over Thanksgiving, and when he came back, he was -- he
had an office visit here at the U.S. Probation Office.  They
wanted to do a UA on him, and, well, he decided to walk away,
at least initially.  He walked across the street.  Ends up
getting into a car.  Well, that was with another person who was
on federal supervision -- presentence supervision.

THE COURT:  Who was that?

MR. VOLK:  That's Robert Robinson.  And they were in
a car that was -- that belonged to another person on pretrial
supervision for drug conduct, and that was Mandy Miller.  And,
you know, so he's associating with other individuals that, you
know, are involved in similar conduct as he is.  Both of those
individuals are involved in drug cases.

It looked like Ms. Miller was living at his place,
based on what probation found.  That's referred to in paragraph
84 of the Presentence Report.  Her belongings are over at his
apartment, and Ms. Miller ultimately was revoked.  Her
supervision -- pretrial supervision was revoked after, you
know, officers found her in possession of methamphetamine over
at Mr. James' apartment.

You know, Mr. James, despite -- I know he has a
number of different jobs.  We ended up pulling $30,000 out of
his apartment.  He's -- there's no jobs that are making
$30,000.

11

1          THE COURT:  That was a search recently?

2          MR. VOLK:  It was a search at his apartment, yes,

3     Your Honor.

4          And then ultimately we ended up with the situation

09:13  5     here in early January where, you know, he's alleged to have

6     engaged in the new criminal conduct with, you know, intentions

7     of engaging in sex with a 16-year-old, which is pretty clear

8     from, you know, the affidavit, what his intentions were.  I'm

9     sorry, from the chat log and the affidavit together.

09:13  10          So Mr. James is really kind of going downhill, it

11     looks like to me, from the point in time that he was initially

12     released where it appeared he was doing very well.  He did --

13     he did transition successfully from the residential re-entry

14     center.  Once he was released from detention, he went there and

09:13  15     appeared to be working, appeared to be complying, appeared to

16     be doing well.

17          But things have rapidly gone downhill here towards

18     the end of his supervision term and leading up to sentencing,

19     and he appears to be reverting back to his conduct that led to

09:14  20     what's -- what's involved in the instant offense conduct, Your

21     Honor.

22          So ultimately, Your Honor, we think that the term of

23     imprisonment of 110 months is very reasonable and appropriate

24     in this case, and we would ask that the Court impose that.

09:14  25          THE COURT:  Thank you.  Ms. Monteiro.

1          MS. MONTEIRO:  Your Honor, we're asking for a

2     sentence of 60 months, with 5 years supervision to follow.

3     I'll point out to the Court that there is no mandatory minimum

4     here, so the Court is free to consider the 3553(a) factors

09:14   5

6

7

8

9

09:15   10

11

12

13

14

09:15   15

16

17

18

19

09:15   20

21

22

23

24

09:15   25

13





 1

 2

 3

 4

09:18    5

 6

 7

 8

 9

09:19   10

11

12

13

14

09:19   15

16

17          His co-defendants have also pled guilty, and that's

18     one thing I wanted to point out, the low sentence that the

19     co-defendants received.  And I realize Mr. James is more

09:19   20     involved than these co-defendants, but they received very light

21     sentences.  Mr. Windy Boy received a year and a day, and Ms.

22     Keyes got time served.

23          THE COURT:  Neither of whom had criminal histories

24     that even came close to what Mr. James had

09:19   25     and didn't go out and commit other crimes

16

1   while awaiting sentencing.

2          MS. MONTEIRO:  Correct.  And it --

3          THE COURT:  It's apples versus orange.

4          MS. MONTEIRO:  It is, but the sentence we're asking

5   for is, in essence, five times what Mr. Windy Boy got.

17





09:22

09:23

09:23

09:23

21          MS. MONTEIRO:  Except that when Mr. James was out and

22   he was doing well and -- he, in essence, had several jobs.  He

23   was doing volunteer work for the United Way.  He was working

24   with the pastor.  I --

09:24

25          THE COURT:  But he was also committing criminal acts.

19

1    MS. MONTEIRO:  Well, Your Honor, he's been charged

2 with that in state court, and --

3    THE COURT:  I read the text.  I wouldn't want to have

4 -- play that out in front of a jury in North Dakota and see how

09:24 5 that turns out.  You don't have to read too much into the text

6 to be able to figure out what was going on.

7    And if you search somebody's residence and find

8 $30,000 cash, you don't have to be a rocket scientist to figure

9 out if he's working construction, concrete work in town, he's

09:24 10 not netting $30,000 in a six-month timeframe from that work, so

11 we all know what was going on.

12    MS. MONTEIRO:  Your Honor, he actually is in the

13 process of getting for me documentation as to where that money

14 came from.  He has already provided me with, and I just saw it

09:24 15 this morning when I came in, a bill of sale from a home that

16 had been sold in Michigan that he had, so --

17    THE COURT:  Who sells a home and then carries $30,000

18 cash in an apartment in North Dakota?

19    MS. MONTEIRO:  I don't know, Your Honor.

09:24 20    THE COURT:  Who does that?

21    MS. MONTEIRO:  Some people don't have bank accounts,

22 so I don't know.

23    THE COURT:  Yeah.

24    MS. MONTEIRO:  Most of us have bank accounts, but

09:25 25 some people who have different lifestyles don't.  I don't know,

1  Your Honor, but I do know that, like I said, he is working on

2  documenting it, where this money came from.

3  ///////////////////////////////////////////////////////

4  ///////////////////////////.

09:25

5  And the fact of the matter is when he was out before

6  this unfortunate arrest -- I agree that the text messages are

7  problematic, but what I will say is that, first of all, my

8  understanding is this was -- he was responding to an ad from

9  somebody purporting to be 27 years old, so this would not be a

09:25

10  situation where he's actively seeking out some underage person.

11  THE COURT:  Well, the ads were -- it was all part of

12  a sting operation, and the people that do those stings are

13  smart enough to know that they don't portray themselves as

14  27-year-olds.  They always portray themselves as minors because

09:25

15  that's the only way that you can get somebody that's on the

16  Internet looking for a minor.  So, I mean, I haven't seen the

17  ads, but I'd be shocked if the ad said anything about an adult.

18  MS. MONTEIRO:  I was told the ad was for a

19  27-year-old.

09:26

20  THE COURT:  Well, the text messages clearly reveal

21  that we're not talking about a 27-year-old.

22  MS. MONTEIRO:  Correct, and it appears then what

23  happened is the response was to an ad for a 27-year-old, and

24  then it turned into a younger person.  And one thing I will

09:26

25  point out -- and, again, you know, ignorance of law is not a

21

1    defense, but 16 is the age of consent in many states, including

2    Minnesota, which again, it's against the law --

3            THE COURT:  Well, it's 15 in Texas too, but that

4    doesn't make any difference.

09:26

5            MS. MONTEIRO:  Right.  I agree.  I just -- I think

6    that, again, Mr. James will have to deal with that charge on

7    his own.  I don't know what he's facing on that.

8            But if we look at his conduct here, if we just take

9    that out, we look at the fact that he was working three jobs,

09:26

10   he was doing volunteer work for the United Way, he has had a

11   obviously less than desirable upbringing, he grew up -- his

12   mother is an addict.  We asked his mother to write a letter on

13   his behalf, and I don't know if the Court was able to read the

14   letter, but --

09:27

15           THE COURT:  Yeah, I did.

16           MS. MONTEIRO:  -- physically his mom was under the

17   influence when she was writing the letter, and that's pretty

18   obvious from reading the letter, and it's unfortunate that that

19   is what Mr. James grew up with.  And he grew up with using with

09:27

20   his mother.  He grew up selling drugs so his mother didn't have

21   to prostitute to get drugs.

22           He never knew his father.  He's involved primarily

23   with his grandparents.  Dropped out of school when he was in

24   the ninth grade, and, unfortunately, selling drugs almost

09:27

25   became a way of life for him, so this is not somebody that has

22

1  had the opportunities that most of us have had in life, and I

2  think that's something that should be considered.

3  I think Mr. James does know and spoke at length, at

4  least with me and I think in the Presentence Investigation, how

09:27  5  destructive it is to be bringing opiates to this state,

6  specifically to these rural communities and specifically to the

7  Fort Berthold Indian Reservation.  And I think some people,

8  when they get involved in this, bringing these drugs here, they

9  don't understand.  They just say, "Oh, yeah, I can make some

09:28  10  money."  I think he's since understood the destruction and the

11  crisis it has caused by doing this.

12  ///////////////////////////////////////////////////////////

13  ///////////////////////////////////////////////////////

14  ////////////////////////////////////////////////////////////

09:28  15  ////////////////////////////////////////////////////////////

16  //////////////////////////

17  So we do think that a 60-month sentence is

18  appropriate here.  It's fair.  It's reasonable.  It's

19  consistent with what other people have gotten.

09:28  20  I would also ask the Court to keep in mind that he

21  did successfully complete Centre.  I believe he was there for

22  158 days, so whatever court -- time the Court thinks is

23  appropriate, I'd ask you to reduce it by that 5 months that he

24  successfully completed at Centre.

09:29  25  ///////////////////////////////////////////////////////////

1 ////////////////////////////////////////////////////////////////

2 ////////////////////////////////////////////////////////////////

3 ////////////////////////////////////////////////////////////////

4 ////////////////////////////////////////////////////////////////

09:29   5 ////////////////////////////////////////////////////////////////

6 ////////////////////////////////////////////////////////////////

7 //////////////////

8         THE COURT:  All right.  Thank you.  Mr. James, I am

9 also required to give you the same opportunity to speak as

09:29   10 everyone else has had, so you're free to say whatever you would

11 like to say here today.  You're free to ask questions as well

12 if you wish.

13         THE DEFENDANT:  Yeah, I'd just like to apologize to

14 the state of North Dakota, and it's been -- it's been hard for

09:29   15 me my whole life, no -- no one to just, you know, love you and

16 be there for you, but I wasn't able to have that because my

17 mother been on drugs my whole life.  I never had a father, and

18 I don't have any siblings, so I had to watch my surroundings

19 and what they did, and -- and I just didn't -- I never had no

09:30   20 one.  I never had no structure.  Like no one really cared for

21 me.

22         So, yes, I did sell drugs.  I started selling drugs

23 because people were selling drugs to my mother.  And I was

24 16 years old, going to school, and my next-door neighbor said,

09:30   25 you know, "Your mother owe me $20," you know, and it hurt.

24

1          And I know I have done wrong, and -- and I'm not
2   perfect, and the stuff that they going to show you on paper is
3   going, you know, make it like I'm just no good or I'm an animal
4   or whatever.  But I am a good person, you know.  You just don't
5   see certain things.  You only seen the bad stuff.  That's the
6   only thing they're going to show you is -- is the downfall.

7          But I'm a God-fearing man.  I love -- I love God and
8   -- and I know I have done wrong, and I know that I should be
9   punished for it, but it's just, I just never had no one to help
10  me or to show me what's right or what's wrong.

11          Yes, I had my grandparents, but they was at work all
12  the time, so they -- they couldn't -- you know, they raised the
13  their kids already, you know.  I never had uncles to help -- to
14  help me do anything.  It's just, I had to watch from my
15  environment.  I'm a product of my environment.  I'm a product
16  of what -- what happens when you live in a city where this is
17  what goes on, and I just ask the Court to understand that.
18  And, you know, I know that you don't probably understand me,
19  but I didn't want to be this way.  I wanted to be, you know,
20  successful.

21          And the reason that I had the money in my home is I
22  brought the money from home, from Michigan.  I had had money
23  that I had saved because I was going to buy a business down
24  here, so that's the reason that I had brought the money from
25  Michigan when I went home to inquire of a business.  I wanted

25

1    to change, and I tried to change, and I tried to do the right

2    thing, but it just -- it just me.

3           And I got five children that love me, and I love

4    them, and I support them.  And I pay my child support, and I do

09:33    5    things for them.  And that's all I have to say, Your Honor.

6           THE COURT:  But is the money that you saved to

7    accumulate this $30,000 money from drug trafficking in Michigan

8    and elsewhere?

9           THE DEFENDANT:  No, Your Honor.

09:33    10           THE COURT:  How does one save $30,000 cash --

11           THE DEFENDANT:  When --

12           THE COURT:  -- otherwise?

13           THE DEFENDANT:  When I got locked up -- when I got

14    indicted in 2018, I had a home that I sold for $12,000.

09:34    15           THE COURT:  All right.

16           THE DEFENDANT:  I have a friend that works for

17    General Motors.  She's been in my corner.  She gave me $10,000

18    just recently.  She just came here, and she left on the 25th of

19    December.

09:34    20           THE COURT:  Who's that?

21           THE DEFENDANT:  Eureka.

22           THE COURT:  What?

23           THE DEFENDANT:  Her name is Eureka.

24           THE COURT:  Eureka?

09:34    25           THE DEFENDANT:  Yes, and she sent the letter and

26

1   notarized with her check stub.  And she had got a bonus for

2   4,500.

3           And the other money is that money that I been having

4   from working.  I worked three jobs.  When I was in Centre, I

09:34   5   didn't have to pay any money to stay in Centre, so I was

6   working two jobs for five months.  I saved $7,000.

7           Two of my kids' mother came down in January of '18 --

8   of '19.  While I was in Centre they both gave me $2,000 because

9   they knew that I was going to be moving out to get a apartment,

09:35   10  so I been saving money.  It's just not from drug money.

11          THE COURT:  All right.  So what'd you do with all the

12  money that you made selling pills up in the New Town area?

13  Because you told me you could make 10 to 15 grand in three to

14  four days selling pills up there.  I assume you saved that,

09:35   15  or --

16          THE DEFENDANT:  Yes.  Upon my arrest in '18 of June,

17  they took 23,000 from me.  That was a lot of the money.

18          THE COURT:  Right.  That's usually what people have

19  on them when they get caught selling in North Dakota, somewhere

09:35   20  in that ballpark range, but usually on their way back to

21  Michigan, cash in that general ballpark range.

22          THE DEFENDANT:  But the money that I had is not from

23  like me saving money from pills or drugs that I already

24  previously had.  Like, you know, in Michigan I am a gambler.  I

09:36   25  have won the lottery in 2017 for $25,000, plus I hit the number

27

1    twice for 7,500 one time and 2,500 like three months apart,

2    so --

3              THE COURT:  And you're filing tax returns that

4    reflect those earnings?

5              THE DEFENDANT:  I didn't file them, but it's like

6    because I had like child -- at the time -- this time I wasn't

7    like paying my child support or -- the state would take some of

8    your money for other things, so like a lot of times when people

9    hit the number, you will give it to like a family member that

10   don't owe any taxes or don't owe anything, and they will cash

11   the ticket in, and that's how you would get the money.

12             MS. MONTEIRO:  He's since paid his child support.

13             THE COURT:  Well, I'm not going to ask any more

14   questions about that because you're probably going to dig

15   yourself into a bigger hole, but anything more that you want to

16   say, sir?

17             THE DEFENDANT:  I'm just -- I'm apologetic.  I know I

18   done wrong by coming up here, selling pills.  I know that I

19   have other charges that are pending right now that -- that

20   looks really bad, but it wasn't --

21             THE COURT:  You better not say anything about that,

22   but -- and I won't ask you any questions about that, but the

23   first exhibit on a big screen in front of the jury are going to

24   be the text messages, and that stuff doesn't play well.  I've

25   seen it play in front of juries in federal court and -- but

28

1    that's for another day and another court and -- but I've

2    handled hundreds of catch-a-predator type schemes, so I know

3    how they work, and I know how those cases play out in front of

4    North Dakota juries.

09:38    5    And sometimes defendants try to assert the defense

6    that they thought they were dealing with a 27-year-old, or the

7    age of consent is actually higher in the state that they came

8    from, but those defenses generally fall on deaf ears in front

9    of a jury, in my experience.

09:38    10    And people also raise other defenses of entrapment,

11    but I've never seen a successful entrapment defense as long as

12    I've been on the Bench, but it doesn't mean people don't try.

13    Generally if you've initiated the conversation, it's kind of

14    difficult to claim that you were entrapped.

09:39    15    But, anyway, is there anything more that you wanted

16    to say, or --

17    THE DEFENDANT:  No, Your Honor.

18    THE COURT:  All right.  Anything more that either

19    counsel want to say?

09:39    20    MR. VOLK:  No, Your Honor.

21    MS. MONTEIRO:  The only thing I wanted to say, Your

22    Honor, is I did provide a document to the Court that Mr. James

23    has now completely caught up on his child support.

24    THE COURT:  I did see that.

09:39    25    MS. MONTEIRO:  Okay.  So I just --

29

1          THE COURT:  That's all good.

2          MS. MONTEIRO:  -- wanted you to know that.

3          THE COURT:  I've reviewed the Presentence

4    Investigation Report and the Sentencing Memorandums of both

5    parties.  I incorporate by reference into my judgment all of

6    the undisputed facts in the Presentence Report and all of the

7    factual information in the Sentencing Memorandums.  And all of

8    that information is also incorporated by reference into my

9    assessment of sentencing factors under 18 USC, Section 3553(a).

10          The Presentence Report established an overall offense

11    level of 28 and a criminal history category of V.  As I noted,

12    I believe that that calculation is accurate, but I will respect

13    what the parties had contemplated at the time they entered into

14    the Plea Agreement as to what the appropriate base offense

15    level is, and the parties' agreement was a 26, so I'm going to

16    leave the Presentence Report as it is, but I'll impose a

17    sentence in accordance with a base offense level of 26.

18          But I hope that you understand, Mr. James, that the

19    base offense level for your crime that I'm adhering to is

20    certainly less than what the actual quantities are.  And you

21    made some admissions at the change of plea hearing and -- where

22    one could conclude that you actually were coming here twice a

23    month.  I think you said you may have come a couple of times a

24    month for six to seven months.  And you take the pills that you

25    acknowledged as being three to four hundred per trip, and it's

1   going to bump your sentence up considerably higher than what

2   you're looking at by my respecting the Plea Agreement.

3        And in my experience, having dealt with thousands of

4   defendants, most defendants, they get caught with their pants

5   down drug trafficking tend to minimize the quantities that they

6   were bringing into the state rather than being completely

7   honest about it, but I'm not holding that against you either.

8   But I think that if one wanted to dig a little deeper in this

9   case, you could certainly establish by more than a

10  preponderance of the evidence much higher quantities than what

11  the parties ever agreed on in the Plea Agreement.

12        There have been no motions for any traditional

13  downward departures in this case, so I need not address that.

14        There has been a request for a variance, giving

15  consideration to the sentencing factors under 18 USC,

16  Section 3553(a).  I'm well aware of all of those factors.  I've

17  given them all consideration in this case.

18        And the Eighth Circuit Court of Appeals has

19  repeatedly said that sentencing judges in this circuit, when

20  addressing the 3553(a) factors, are entitled to rely upon

21  undisputed facts in the Presentence Report.  We're entitled to

22  rely upon information contained in Sentencing Memorandums and

23  in Supplements.  We're entitled to rely upon arguments of

24  counsel and statements made by a defendant at a sentencing

25  hearing.  All of that information I rely upon.

31

1      I will vary in this case simply to honor the Plea

2  Agreement of the parties, but beyond that, I would not choose

3  to vary from the guideline range.

4

5

6

7

8      So pursuant to the Sentencing Reform Act of 1984,

9  it'll be my judgment, Mr. James, that you shall be committed to

10  the custody of the Bureau of Prisons to be imprisoned for a

11  period of 120 months, less credit for time served, thereafter

12  placed on supervised release for a period of 3 years, subject

13  to a number of conditions that I'll summarize.  I'm ordering

14  that you pay a special assessment of $100.  I'm not imposing a

15  fine of any sort.  I believe that's a sentence that's

16  sufficient but not greater than necessary.

17      And I have taken into consideration in imposing that

18  sentence the approximate 5 months served at Centre, Inc.

19

20

21

22

23

24

25

32

1        And I don't minimize the environment that you grew up

2   in and the fact that that probably had a lot to do with molding

3   your criminal misconduct, but you're now, what, 39 years old?

4        THE DEFENDANT:  Yes, Your Honor.

5        THE COURT:  You know right from wrong.  You know that

6   it's wrong to traffic drugs.  You know that it's wrong to

7   commit other crimes that you've been involved in, and you don't

8   need a mother or father around to tell you that because you've

9   learned over the course of your adult life what's right and

10  wrong.

11       I just don't quite understand why you would continue

12  to engage in the kind of behavior that you were charged with in

13  state court now because it's just going to muddy up your life

14  considerably.  But maybe you'll be able to negotiate something

15  out with the State of North Dakota, and -- in light of the

16  sentence that you've received here, and -- but have you ever

17  watched Catch-A-Predator, the TV show?

18       THE DEFENDANT:  No, Your Honor.

19       THE COURT:  All right.  Ever read the Bismarck

20  Tribune?

21       THE DEFENDANT:  Yes.

22       THE COURT:  The conditions of supervised release that

23  I'm ordering that you comply with are all going to be laid out

24  in the judgment that I'll sign, and you'll get a copy of the

25  judgment.

33

1      You'll be required to comply with what are known as

2  standard conditions of supervised release, and those are

3  conditions that every defendant sentenced in this country in

4  federal court is required to comply with.  The standard

09:46    5  conditions of supervision require that you live a law-abiding

6  lifestyle.  If you violate any laws of any sort, federal, state

7  or local laws, that's considered a violation of the conditions

8  of your supervision.

9      You're prohibited from using street drugs.  You are

09:47   10  also prohibited from even associating with people that use

11  street drugs, including weed smokers.

12      You are prohibited from associating with people that

13  have felony convictions on their record unless the United

14  States probation officer that's supervising you approves that.

09:47   15      You are prohibited for the rest of your life from

16  ever possessing firearms or ammunition.  Congress has said that

17  if you're convicted of a felony in the federal criminal justice

18  system, you are barred for life from possessing firearms or

19  ammunition.  Were you aware of that?

09:47   20      THE DEFENDANT:  Yes, Your Honor.

21      THE COURT:  And what you need to keep in mind is that

22  possession of a firearm tends to be a broadly defined term

23  under federal law.  It certainly means you can't own or handle

24  a gun, but it also means you can't be around guns.  So you need

09:48   25  to be careful about who you're associating with, who you're

34

1    living with, who you're traveling with in motor vehicles,

2    because if there's guns in any of those venues and you're

3    around, they're going to charge you with being a felon in

4    possession of a firearm or ammunition.  You don't have to

09:48   5    handle the gun to be charged and convicted of that crime.  Do

6    you understand?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  So if you go anywhere in life for the

9    rest of your life and there's a gun around, you better get

09:48   10   yourself out of there fast as you can run because you'll get

11   charged with felon in possession.

12             The conviction rate is extremely high in the federal

13   system.  By "high," I mean 99.5-plus percent.  And that crime,

14   with your criminal history, will get you eight to ten years.

09:49   15   It doesn't matter what judge you're in front of.  With a

16   Criminal History Category V or probably a VI, that's what

17   you're looking at.

18             And if you ever get caught up in any drug trafficking

19   scheme that results in a charge in federal court, whether it's

09:49   20   Michigan, North Dakota, Minnesota or any place else, if there's

21   a next time for you where you're convicted, it's 15-plus years

22   in the federal system.  Do you understand that?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  It doesn't matter what judge you're in

09:49   25   front of.  U.S. Attorney's Office is going to certify your

1    prior drug trafficking offense, which ramps up the sentence to

2    at least 15 years under the current laws.

3           And then, finally, among the standard conditions is

4    you're -- you will be assigned a probation officer that you'll

09:50   5    have to check in with regularly, and if you don't check in, it

6    usually means there's trouble, and then they write you up and

7    back we are in court.

8           Special conditions that I'm ordering are that you

9    must participate in any form of drug or alcohol treatment

09:50   10   recommended by the United States Probation Office.  You are

11   ordered to abstain from using alcohol, street drugs, inhalants

12   and synthetic drugs.  That means shall not use.  It includes

13   marijuana, whether it's legal or not.  Is recreational

14   marijuana legal in Michigan now?

09:50   15          THE DEFENDANT:  Yes.

16          THE COURT:  Okay.  Well, it's not in the federal

17   system yet.

18          So you'll be required to submit to random drug and

19   alcohol screening or testing.  You must participate in any

09:50   20   other form of counseling or treatment or programming or classes

21   recommended by the United States Probation Office.

22          Another special condition is that you can be placed

23   in a halfway house at any time while you're on supervised

24   release and would be required to follow all of the rules and

09:51   25   regulations of that facility.

36

1          And, last of all, I'm ordering a search clause, and
2     search clauses are regularly, uniformly ordered for every
3     defendant in the federal system and in the state system in
4     North Dakota, I believe.  Search clauses simply mean that while
09:51  5     you're on federal paper, you can be searched any time, any
6     place, whether it's you, your personal belongings, residences
7     that you're living in or visiting at, places that you work,
8     motor vehicles you travel in, computers, computer devices, cell
9     phones, smart phones.  Everything and anything can be searched
09:51  10    by the United States Probation Office.

11          And they don't need a search warrant or a Court order
12    to conduct such a search.  Everybody that's sentenced in a
13    federal criminal case has that same condition.

14          None of these conditions that I've ordered are
09:52  15    unusual or out of the ordinary.  You have not in any way been
16    targeted by the conditions that I've ordered, but do you have
17    any questions about any of those conditions?

18          THE DEFENDANT:  No, Your Honor.

19          THE COURT:  Under the current state of the law, the
09:52  20    Bureau of Prisons is required to place you within 500 miles of
21    your residence if there is space available.  But the Bureau of
22    Prisons also strongly recommends that the sentencing judge make
23    recommendations in their judgments for placement, and they --
24    BOP tells us that they try to honor the recommendations that we
09:52  25    make for placement in a particular prison or a particular city

1   or geographical area.  And I don't know, Ms. Monteiro, if you

2   and Mr. James have visited about that, or --

3           MS. MONTEIRO:  Your Honor, just if you could

4   recommend, you know, whatever the closest appropriate facility

09:53   5   is to his home in Flint, Michigan.

6           THE COURT:  Flint, Michigan.  Okay.  I'll do that.

7           Finally, sir, I need to inform you that you do have a

8   right to appeal.  If you feel you haven't been treated fairly,

9   you always have a right to appeal in the federal system.

09:53   10  However, the time period for any defendant to ever appeal in a

11  federal case is 14 days, and the 14 days starts to run today,

12  as soon as I sign the final paperwork.  And the final paperwork

13  is known as a judgment.  I'll sign that today.

14          As soon as I sign it, the attorneys will be

09:53   15  immediately notified electronically, and that's what starts the

16  clock ticking for your appeal, so you will have 14 days from

17  today to appeal anything that I've ordered.  I don't hold it

18  against you if you want to appeal.  Everybody has a right to

19  appeal.

09:54   20          And if you want to appeal, you just need to tell Ms.

21  Monteiro that that's what you want to do.  She can file the

22  necessary paperwork to protect your appeal rights, but what she

23  needs to file is just a one-page document called a notice of

24  appeal.  As long as that's filed within 14 days from today,

09:54   25  your appeal has been protected and preserved.  If there's no

1  notice of appeal filed within 14 days, then you've lost your

2  right to appeal forever.  Do you understand that?

3         THE DEFENDANT:  Yes.

4         THE COURT:  I would point out that you signed a Plea

5  Agreement, and in the Plea Agreement you agreed that you would

6  give up your right of appeal in exchange for any sentence up to

7  the high end of the guidelines, and the guideline range in this

8  case was 130 to 162.  I varied downward to what the parties had

9  agreed on, and that guideline range is 110 to 137.

10         So no matter how you look at it, the sentence was

11  within the guideline range, so I believe you've given up your

12  right of appeal in the Plea Agreement, like most defendants do

13  as long as they're sentenced in accordance with the guidelines,

14  but do you have any questions at all about your right to

15  appeal?

16         THE DEFENDANT:  No, sir.

17         THE COURT:  Either counsel wish to voice any

18  objections to the below-guideline sentence that I've imposed in

19  this case?

20         MR. VOLK:  No, Your Honor.  I would note, as I

21  mentioned earlier, I think we need to dismiss the petition to

22  revoke his release since the Court has imposed its sentence.

23         And then I believe as well he pled guilty to Count 1,

24  and Count 2 needs to be dismissed.

25         THE COURT:  I'll dismiss Count 2 with prejudice.

39

1    I'll dismiss the petition to revoke and all proceedings related

2    to the revocation petition.  But no objections to what's been

3    ordered?

4              MR. VOLK:  No.

5              THE COURT:  Ms. Monteiro?

6              MS. MONTEIRO:  No, Your Honor.

7              THE COURT:  Mr. James, any questions?

8              THE DEFENDANT:  No, sir.

9              THE COURT:  So I'll remand you back to the custody of

10   the U.S. marshals.  It could be anywhere from two weeks to

11   several months before the BOP tells us where they have chosen

12   to place you.  In the past it would be two to three weeks.

13   Lately it's two weeks to four months.  The wheels at the BOP

14   aren't moving very quickly, so I --

15             But you'll remain in North Dakota until the Bureau of

16   Prisons lets the marshal service know where they're going to

17   place you.  And the BOP will calculate the precise number of

18   days you've been in custody, and they give you credit for all

19   of that.

20             Very well.  We'll stand adjourned.

21             (Proceedings concluded at 9:57 a.m., the same day.)

22                      - - - - - - - - - -

23

24

25

1              <u>CERTIFICATE OF COURT REPORTER</u>

2          I, Sandra E. Ehrmantraut, a Certified Realtime

3    Reporter,

4          DO HEREBY CERTIFY that I recorded in shorthand the

5    foregoing proceedings had and made of record at the time and

6    place hereinbefore indicated.

7          I DO HEREBY FURTHER CERTIFY that the foregoing

8    typewritten pages contain an accurate transcript of my

9    shorthand notes then and there taken.

10         Dated:  August 25, 2020

11

12                              <u>/s/ Sandra E. Ehrmantraut</u>
                                Certified Realtime Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

41